**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAMES ANDREW MITCHELL SR.,
               Plaintiff

    v.

NANCY A. BERRYHILL,[1]

Acting Commissioner of Social Security

               Defendant.

**OPINION AND ORDER**

**15 Civ. 6595 (PED)**

## I.   INTRODUCTION

Plaintiff James Andrew Mitchell, Sr. ("Plaintiff," or "Claimant,") brings this action

pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security

("Defendant" or the "Commissioner") denying Plaintiff's application for disability insurance

benefits. Dkt. 2. The matter is before me pursuant to a Notice, Consent and Reference of a Civil

Action to a Magistrate Judge entered October 26, 2015. Dkt. 7. Presently before this Court is

Defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure, Dkts. 10 (Defendant's motion), and 11 (Defendant's memorandum of law).

Defendant's motion for judgment on the pleadings is unopposed. Notably, the Court's June 10,

2016 scheduling order warned the *pro se* Plaintiff as follows:

> Plaintiff is cautioned that, unless he submits a response, the Court
> will evaluate the case based on Defendant's submissions alone.

Dkt. 15.

To date, Plaintiff has not filed any opposition. For the reasons set forth below

Defendant's unopposed motion for judgment on the pleadings is **GRANTED**.

---

[1]    Nancy A. Berryhill is now the Acting Commissioner of Social Security and is
substituted for former Acting Commissioner Carolyn W. Colvin as the Defendant in this action,
pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

## II.    BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration, Dkt. 12, filed by Defendant in conjunction with the Answer on June 9, 2016. Dkt. 13.

### A.    Application History

On February 15, 2013, Plaintiff filed a Title XVI application for Supplemental Security Income ("SSI"). R. 123-131. His application was denied. R. 61-64. Plaintiff timely requested a hearing before an ALJ on April 26, 2013. R. 65-70. On May 19, 2014, Plaintiff appeared before ALJ James Kearns represented by counsel, David Levine. R. 28-50. On July 30, 2014, the ALJ issued an unfavorable decision. R. 9-21. The ALJ's decision became the final decision when the Appeals Council denied Plaintiff's request for review on July 9, 2015. R. 1-7. Plaintiff timely filed this action on August 20, 2015. Dkt. 2.

Plaintiff was born on September 7, 1969. R. 51. In his initial claim for disability, dated January 28, 2013, Plaintiff noted that he suffered from thyroid problems, hypoglycemia[2] and hypocalcemia,[3] and alleged that he had been disabled since October 1, 2012 (the "Alleged Disability Onset Date"). R. 251. Plaintiff has not worked since he was laid off of his job on January 1, 2008. R. 142.

### B.    Medical History

The administrative record contains various medical treatment records. Dkt. 12. The following is a distillation of their relevant points.

---

[2]    Hypoglycemia is reduced blood sugar. *Hypoglycemic*, Attorneys' Dictionary of Medicine.

[3]    Hypocalcemia is the presence of less than the normal amount of calcium in the blood. *Hypocalcemia*, Attorneys' Dictionary of Medicine.

### 1. Plaintiff's Thyroid Condition

On April 13, 2012, Dr. Walter Ralph, an otolaryngologist, noted that Plaintiff's physical exam showed a large thyroid gland, but that his primary complaint was difficulty breathing when he leaned backwards. R. 288. Dr. Ralph found that Plaintiff did not show any evidence of hyperthyroidism but decided to order thyroid function studies to measure Plaintiff's thyroid and rule out hypothyroidism or hyperthyroidism.[4] R. 288. An ultrasound of Plaintiff's thyroid dated June 5, 2012 showed thyromegaly[5] and bilateral nodules. R. 246.

At Plaintiff's follow up visit with Dr. Ralph on September 14, 2012, Dr. Ralph noted that Plaintiff's thyroid ultrasound and examination confirmed that Plaintiff had a massive thyroid goiter but no evidence of hypothyroidism or hyperthyroidism. R. 303. Following Dr. Ralph's recommendation, Plaintiff had surgery to remove his thyroid on October 24, 2012. R. 214, 219-22, 305-07. The following day, Dr. Radoslav Toshkoff conducted a neck exploration surgery to address Plaintiff's neck swelling, difficulty swallowing, and shortness of breath resulting from his thyroidectomy. R. 196, 308-13. Dr. Toshkoff removed Plaintiff's neck hematoma, and sent Plaintiff to the recovery room in stable condition. R. 196. Plaintiff was discharged on October 26, 2012 and was advised to follow up with Dr. Ralph in a couple months. R. 358.

On December 6, 2012, Plaintiff followed up with Dr. Ralph to discuss his condition post-thyroidectomy. R. 314. At that appointment, Plaintiff complained of lethargy, numbness, and

---

[4]     Hyperthyroidism is a condition resulting from an abnormal and/or excessive activity of the thyroid gland. The thyroid gland is situated in the front and lower part of the neck. The outstanding symptoms are nervousness, rapid beating of the heart, protrusion of the eyeballs (exophthalmos), excessive perspiration, trembling of the fingers, increased rate of metabolism, and other ailments. *Hyperthyroidism*, Attorneys' Dictionary of Medicine.

[5]     Thyromegaly is a disorder of the thyroid gland when it becomes larger than its normal size. This disorder is commonly known as goiter. *Thromegaly*, Attorneys' Dictionary of Medicine.

tingling but noted that his breathing had improved since his thyroid goiter was removed. R. 314-18. Dr. Ralph recommended that Plaintiff obtain blood work and prescribed Plaintiff calcitriol and calcium supplementation. R. 314-17. Two days later, on December 8, 2012, after laboratory tests showed abnormally low calcium levels, Plaintiff went to the emergency room for intravenous calcium supplementation. R. 247, 319. The attending physician in the emergency room reported that Plaintiff had full (5+) muscle strength throughout, had a normal gait, was neurologically intact, had normal sensation, was fully oriented, and exhibited negative Trousseau and Chvostek's signs. R. 320-21, 330. From December 8, 2012 through December 10, 2012, Plaintiff's calcium levels started at 5.5 mg/dL and rose to 8.0 mg/dL with calcium supplementation. R. 247-53, 328-32. Plaintiff signed out against medical advice on December 10, 2012 before his goal calcium level of 8.5 mg/dL was reached. R. 332.

An urgent care record from Bronx-Lebanon Hospital showed that Plaintiff was also treated for hypocalcemia a week later on December 17, 2012 and December 18, 2012. R. 215-16, 223, 362-63, 372. On December 24, 2012, Plaintiff was again admitted at Bronx-Lebanon Hospital for tingling in his upper and lower extremities. R. 179. Upon admission, Plaintiff had a calcium level of 6 mg/dL. R. 186, 263, 339-48. The attending physician treated him for hypocalcemia with calcium administered intravenously and orally. R. 179. Again, Plaintiff's physical examination was unremarkable. He was neurologically intact, had normal strength and sensation, and a normal gait. R. 179, 198-99, 338. Plaintiff's total calcium level ranged from 6.1 to 6.9 mg/dL. R. 181, 267, 270, 274, 276, 341-43. During his hospital admission, Plaintiff consulted with Dr. Shivaji Kadam, an attending cardiologist. R. 179. Plaintiff's electrocardiogram ("EKG") was normal and showed normal mitral valve structure and function; an aortic valve that was not well visualized; a tricuspid aortic valve with focal thickening; a

normal tricuspid valve structure and function; a normal left atrium; concentric remodeling of the left ventricle ("LV"), normal LV ejection fraction, grade 1 diastolic dysfunction impaired, and LV relaxation with normal filling pressure; a normal right atrium; normal right ventricle structure and function; normal pericardium without evidence of pericardial effusion; insufficient tricuspid regurgitant ("TR") to assess right ventricular systolic pressure ("RVSP"); normal great vessels size; and a pulmonic valve that was not well visualized. R. 183, 199-204, 345-46, 352. The attending physician diagnosed Plaintiff with symptomatic hypocalcemia, now resolved, from post-surgical hypoparathyroidism from a thyroidectomy in October 2012. R. 185, 347. The attending physician questioned Plaintiff's adherence to his medication regimen because Plaintiff failed to follow up with his endocrinologist after he was last treated for hypocalcemia on December 18, 2012. R. 185. The attending physician advised Plaintiff to continue with 1 mcg calcitriol daily, prescribed calcium carbonate 1250, and increased Plaintiff's levothyroxine dose to 150 mcg daily. R. 185, 347.

On December 28, 2012, Plaintiff saw Dr. Ralph to address his complaints of heat and cold intolerance, fatigue, dry skin, and bilateral intermittent cramps and numbness in the toes. R. 240. Plaintiff listed his medications as magnesium gluconate 500 mg; Levothyroid; hydrochlorothiazide; calcitriol; and calcium carbonate. R. 241. Although Plaintiff moved slowly, Dr. Ralph noted that his physical examination was unremarkable, his reflexes were intact, and he showed no Chovstek's sign. R. 241. Dr. Ralph recommended that Plaintiff continue on his medication. R. 244.

On January 31, 2013, Plaintiff saw Dr. Ralph for a follow up visit. R. 238. Dr. Ralph noted that Plaintiff was recently discharged from the hospital for control of extreme hypocalcemia and that Plaintiff reported feeling much better, complaining only of a minimal

tingling sensation in his feet and fingers. R. 238. Dr. Ralph reported that Plaintiff's last calcium level, taken on December 28, 2012, was 8.5 mg/dL. R. 238, 277. His last thyroid stimulating hormone ("TSH") measured at 17.547, even though normal values range from 0.4 - 4.0 milli-international units per liter (mIU/L). R. 236, 238, 279. However, Plaintiff's TSH levels were measured only days after a dosage adjustment so Dr. Ralph recommended that Plaintiff get additional bloodwork done that day. R. 236, 238, 279.

On February 1, 2013, Plaintiff saw Dr. Sharon Kim, an endocrinologist about fatigue, cold intolerance, and dry skin. R. 233-37. Plaintiff listed his medications as magnesium gluconate 500 mg; Levothyroid; hydrochlorothiazide; calcitriol; and calcium carbonate. R. 234. Plaintiff's physical examination was unremarkable aside from his high blood pressure at 149/92 mm Hg. R. 234. For a normal reading, blood pressure should show a top number that is lower than 120, and a bottom number that is lower than 80. His blood work showed normal TSH levels at 3.66 mIU/L. R. 235. Plaintiff's calcium level was 9.4 mg/dL. R. 235.

On October 15, 2013, Plaintiff went to Bronx-Lebanon Hospital to address his fever, weight fluctuation, headaches, loss of appetite, unusual bruising and bleeding, skin problems, stuffy nose, dry mouth, cough, shortness of breath, pain in the chest, palpitations, constipations, loss of balance, muscle weakness, paralysis of arms and legs, numbness or tingling of arms and legs, swelling of ankles, and in other joints. R. 360.

### 2. Plaintiff's Right Foot Growth

On May 12, 2012, Plaintiff saw Dr. Aaron Glockenberg, a podiatrist, for right foot pain. R. 289. Dr. Glockenberg noted that Plaintiff had tenderness at the dorsal aspect of the 4th interspace of the right foot associated with a nodular lesion around 5mm in diameter. R. 290. Dr. Glockenberg ordered x-rays, prescribed a foot cream, and recommended that Plaintiff see Dr.

Neal Blitz, a foot surgeon. R. 290. On June 1, 2011, Plaintiff had a magnetic resonance image ("MRI") of his right lower extremity to evaluate the growth on his right foot. R. 205. The study showed a complex cystic mass in the region dorsal to the 4th and 5th metatarsophalangeal joints. R. 205. An earlier biopsy of the right foot growth showed no malignant cells. R. 208.

On June 8, 2011, Plaintiff saw Dr. Blitz for surgical consultation for his right foot soft tissue mass. R. 365-66. Dr. Blitz recommended surgical excision of the right foot soft tissue mass. R. 365. In September 2011, a pathology report of the right foot soft tissue mass showed epidermal inclusion cyst with rupture. R. 209. On July 30, 2012, Plaintiff had surgery to remove the soft tissue mass on his right foot. R. 291-301, 369.

On December 6, 2012, Plaintiff saw Dr. David Wong, a podiatrist, to check up on his status post right removal of a skin lesion on his right foot and underlying soft tissue mass. R. 315. Dr. Wong noted that Plaintiff's wound was resolved and indicated that Plaintiff required no further treatment. R. 315.

### 3. Fibromyalgia

On March 31, 2014, Plaintiff saw Dr. Arlene Tieng, a rheumatologist, for complaints of generalized pain, bilateral knee and ankle swelling and numbness in the arms and legs (although Plaintiff reported that the numbness improved with activity). R. 357. Plaintiff told Dr. Tieng that that he saw another rheumatologist in October 2013 who diagnosed him with fibromyalgia tender points and prescribed coenzyme Q10, which Plaintiff stated he never took. R. 357. He also stated that he never tried physical therapy. R. 357. Again, Plaintiff's physical exam was unremarkable – 5/5 motor strength of neck flexor and all extremities with full muscle strength throughout. R. 357. Plaintiff was able to stand up from the chair without difficulties. R. 357. Dr. Tieng advised Plaintiff to follow up in one month to assess if the coenzyme Q10 medication

helped his condition and suggested switching statins, which could cause Plaintiff's myalgias. R. 357.

### 4. Bilateral leg pain

In April 2014, Plaintiff consulted Dr. Hanasoge Girishkumar, a vascular surgeon, for bilateral leg pain, and spinal stenosis in the lumbar spine with neurogenic claudication. R. 383. Plaintiff attended physical therapy from April 2014 through June 2014 for lower extremity strengthening. R. 384-86.

### 5. Consultative Examination with Internist Dr. Sharon Revan

Plaintiff met consultative examiner, Dr. Sharon Revan, an internist, on April 10, 2013 and reported that he had been hypocalcemic since October 2012 after he had a thyroidectomy. R. 281. Plaintiff complained of bilateral leg swelling, cramps in his calves and feet, tingling and cramping in his legs and arms, fevers, swollen hands, joint pain, and dry mouth and that he could not sit, walk, or stand for long due to cramping and tingling since his thyroidectomy. R. 281. As a result of these ailments, he reported that he is only able to sleep about three to four hours a night and needs to use the bathroom constantly at night. R. 281. Plaintiff reported that his legs do not hurt when he lies down, but they do hurt when he climbed stairs. R. 281.

On examination, Dr. Revan observed that Plaintiff was hunched over and limping on the right. R. 282. He could not walk on his toes, but was able to walk on his heels. R. 282. Plaintiff had a normal stance and could squat halfway while holding on to something. R. 282. Dr. Revan indicated Plaintiff was prescribed a cane and that it was medically necessary. R. 282. Dr. Revan noted that Plaintiff did not need help changing for the examination or getting on and off the examination table. R. 282. Plaintiff was also able to rise from a chair without difficulty. R. 282.

Plaintiff's heart and respiratory examinations were normal. R. 283. Plaintiff's cervical spine showed full range of motion. R. 283. His lumbar spine had almost full range of motion but he complained of back pain on palpation. R. 283. Plaintiff's straight leg raise test was negative bilaterally. R. 283. Plaintiff had full range of motion and full strength in the upper and lower extremities, stable joints, no sensory deficits, no muscle atrophy, and was neurologically intact. R. 283. Plaintiff had intact hand and finger dexterity and full grip strength bilaterally. R. 283. He had no cyanosis, clubbing or edema in the extremities. R. 283. Dr. Revan opined that Plaintiff had no limitation with the upper extremities for fine and gross motor activity. R. 284. He had mild-to-moderate limitations with climbing stairs, walking, sitting, and standing due to his complaints of leg pain. R. 283. Dr. Revan stated that Plaintiff had no limitations with laying down and he had mild-to-moderate limitations with personal grooming and activities of daily living secondary to leg edema. R. 284.

### C. Plaintiff's Hearing Testimony

On May 19, 2014, Plaintiff appeared before the ALJ for his administrative hearing. R. 28-50. Plaintiff testified that he dropped out of school in the tenth grade. R. 32. He is married but has been separated for fifteen years. R. 32. He has three daughters and a son. R. 32. He lives with his son and his mother-in-law in Bronx, New York. R. 32. Plaintiff testified that he takes public transportation to avoid walking long distances. R. 32.

In 2000, he worked as a security guard focusing on "loss prevention" at a clothing store. R. 32. In 2007, Plaintiff worked for the City of New York Parks Department cleaning the park. R. 32. In response to the ALJ's questioning, Plaintiff explained that he had worked infrequently because he had ignored his thyroid condition until it "caught up with me." R. 33. He testified that he cannot work because he is constantly tired and he feels numbness in his legs. R. 34.

9

Plaintiff testified that he occasionally suffers from incontinence. R. 39. He testified that he goes to his endocrinologist every two to three months, his regular doctor once a month, his physical therapist twice a week, and his psychiatrist twice a week. R. 34. At the administrative hearing, Plaintiff could not remember the medications he takes to address his symptoms. R. 35.

Plaintiff testified that on a typical day, if he can get up, he makes sure to send his son to school by 7:30 a.m., he then takes his medicine, and if he does not have a doctor's appointment scheduled, he just sits "still." R. 35. He testified that he cannot cook because his hands fall asleep when he holds things too long. R. 35. As a result, Plaintiff eats "mainly microwave food or lunch meat from the corner store or something like that." R. 35. His son and mother in law handle most of the housework and grocery shopping. R. 35. He testified that he can only walk up to two blocks before he needs to sit and he cannot stand in one place because his legs fall asleep. R. 37.

### D. Vocational Expert Testimony

At the end of the hearing, the ALJ questioned a court-appointed Vocational Expert, Sherry Plant, about Plaintiff's past relevant work, and Plaintiff's work limitations. R. 42-51. The Vocational Expert testified that Plaintiff's past jobs included work as a groundskeeper (DOT # 406.687-010, medium), security guard (DOT # 372.667-034, light), merchant patroller (DOT # 372.667-038, light), and laborer in stores (DOT # 922.687-058, medium). R. 42-43. The ALJ asked the Vocational Expert a hypothetical about whether an individual with these past jobs who was now limited to sedentary exertion level and simple and routine tasks could do any of their past jobs. R. 42. The Vocational Expert testified that such a hypothetical individual would not be able to perform their past jobs but could work as a(n): (i) final assembler (DOT # 713.687-018, sedentary) of which there are 121,132 jobs; (ii) addresser (DOT # 209.587-010, sedentary)

of which there are 12,264 jobs; and (iii) clerk, food and beverage (DOT # 209.567-014, sedentary) of which there are 116,672 jobs. R. 43-44. The ALJ asked whether the availability of such jobs would be affected if the hypothetical individual needed "unscheduled breaks of one hour per day in addition to regular breaks." R. 44. The Vocational Expert testified that it "would be difficult" to accommodate such breaks for a final assembler because "it's a matter of production" but might be feasible in the job of an addresser or clerk. R. 44-46. The Vocational Expert testified that it would be "possible" to sustain some employment if they needed an additional hour a day but might be "more of an accommodation." R. 44. In response to questioning by Plaintiff's attorney, the Vocation Expert conceded that the number of jobs appropriate for this hypothetical would be "reduced." R. 45. The ALJ pushed the hypothetical one step further and asked whether the availability of such jobs would be affected if the hypothetical individual needed "unscheduled breaks of an hour and a half." R. 46. The Vocational Expert testified that a break of an extra hour and a half would go beyond what an employer can accommodate or tolerate. R. 46.

## III.   LEGAL STANDARDS

### A. Judgment On the Pleadings

A Rule 12(c) motion for judgment on the pleadings is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss. *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). Thus, "[t]o survive a Rule 12(c) motion [for judgment on the pleadings], the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks and citation omitted). A *pro se* litigant's pleadings and submissions must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d

Cir. 2006).

In the context of a Social Security benefits appeal, if a motion for judgment on the pleadings is unopposed, the Court may not grant the unopposed motion based merely upon the opposing party's failure to respond; rather, the Court "must review the record and determine whether the moving party has established that the undisputed facts entitle it to judgment as a matter of law." *Martell v. Astrue*, No. 09 Civ. 1701, 2010 U.S. Dist. LEXIS 108061, at *7 n.4 (S.D.N.Y. Oct. 20, 2010) ("[I]n light of the similarity between a motion for summary judgment and a motion on the pleadings in the present context, where there is a fulsome record of the underlying administrative decision, we look to the summary judgment context for guidance."); *see also McCreery v. Commissioner of Soc. Sec.*, No. 13 Civ. 3254, 2014 U.S. Dist. LEXIS 94003, at *12-13 (S.D.N.Y. July 9, 2014).[1]

**B. Standard of Review**

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is "even more" deferential than the "clearly erroneous"

---

[1]     Copies of all unpublished opinions and decisions available only in electronic form cited herein have been mailed to Plaintiff. *See Lebron v. Sanders*, 557 F.3d 76, 78 (2d Cir. 2009).

standard. *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

### C. Statutory Disability

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the SSA only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy

exists for him, or whether he would be hired if he applied for work. *Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.  If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). The claimant bears the burden of proof as to the first four steps of the process. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. *See id.* At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy. *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## IV.   THE ALJ'S DECISION

The ALJ issued a decision on July 30, 2014 following the standard five-step inquiry used for determining disability. R. 12-21. In the first step of the inquiry, the ALJ determined that Plaintiff had not performed substantial gainful activity since the January 28, 2013, his application date. R. 14.

At step two, the ALJ found that Plaintiff's medical issues — hypoparathyroidism status post-thyroidectomy, fibromyalgia, and obesity — rose to the level of "severe" causing "more than minimal functional limitations." R. 14-15.

At step three, further considering the medical severity of Plaintiff's impairments, the ALJ decided that Plaintiff did not meet or medically equal the criteria of listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. § 416.920(d), 416.925 and 416.926 or listing 9.00. R. 15.

At step four, the ALJ considered "the entire record" and made a finding about Plaintiff's residual functional capacity. R. 15. In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence…" R. 15. The ALJ considered Plaintiff's allegations that he is disabled due to symptoms related to his endocrinological impairments because of his constant fatigue, difficulty sleeping at night, numbness and tingling in the extremities, bouts of depression, confusion, and/or urinary incontinence. R. 16. The ALJ found that "the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except he is limited to simple and routine tasks." R. 15.

The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [] not entirely credible to the degree alleged" because, among other things, "the record consistently shows normal strength testing, as well as intact sensation and

reflexes, of the claimant's arms and legs." R. 17. The ALJ also noted that Plaintiff's "inconsistent adherence… to medication management, despite evidence of its effectiveness… suggest that the limiting effects of his symptoms are not quite as severe as he alleges." R. 18. On this point, the ALJ concluded that Plaintiff's "infrequent work activity even for many years prior to the alleged onset date, when he was presumably still able to work" … "raises a real question as to whether his continuing unemployment is actually due to medical impairments." R. 18.

In making the residual functional capacity determination, the ALJ considered the notes and opinions of Plaintiff's internal medicine consultative examiner, Sharon Revan, M.D., who noted Plaintiff's episodes of hypocalcemia since his thyroidectomy, his fevers, general fatigue, swelling of his legs, and tingling and cramping of his legs and arms. R. 17. The ALJ considered Dr. Revan's notes about Plaintiff's limping on the right side, use of a cane, and his inability to fully squat or walk on his toes. R. 17. The ALJ accorded "some weight" to the consultative examiner's opinion that Plaintiff had "no limitations with using the upper extremities for fine and gross motor activity, but has mild to moderate limitations with personal grooming, activities of daily living, climbing stairs, walking, sitting, and standing due to leg pain" because it was "somewhat consistent with the substantial evidence of record." R. 18. However, the ALJ found that the record did "not contain substantial evidence showing that the claimant has problems sitting to the extent opined by Dr. Revan" because it is inconsistent "with the results of Dr. Revan's own examination, which revealed some difficulty with toe walking and squatting, and a need for his cane, but was otherwise largely normal." R. 18-19.

After making the above findings, the ALJ considered whether the claimant would be able to perform any past relevant work and found that Plaintiff would be unable to perform his past

relevant work as a groundskeeper (DOT # 406.687-010, medium, unskilled), security guard (DOT # 372.667-034, light, semi-skilled), or merchant patroller (DOT # 922.687-058, medium, unskilled). R. 19 (citing 20 C.F.R. § 416.965).

The ALJ then considered Plaintiff's age, education, work experience, and residual functional capacity, to determine whether there were jobs that exist in significant numbers in the national economy that the Plaintiff could perform. R. 19. With the help of a vocational expert, the ALJ determined that Plaintiff would be "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." R. 20.

Following these conclusions, the ALJ reached the end of the five-step process, determined that Plaintiff was not disabled, and denied his application for benefits. R. 20.

## V.    ASSESSING THE ALJ'S FINDINGS

The Government moves for judgment on the pleadings on four grounds: (i) the ALJ properly evaluated the medical evidence by finding that Plaintiff's hypoparathyroidism did not meet or equal the requirements of Listing 9.00; (ii) the ALJ properly accorded weight to the opinions of the consultative examiner, Dr. Sharon Revan; (iii) the ALJ properly evaluated the credibility of Plaintiff's subjective complaints; and (iv) the ALJ properly relied on vocational expert testimony at Plaintiff's hearing. Def. Mem.[6] at 12-22. Plaintiff did not file a response to the Government's motion.[7]

---

[6]    Defendant's memorandum of law in support of the commissioner's motion for judgment on the pleadings, ("Def. Mem.").

[7]    Plaintiff *did* annex to his complaint a letter submitted by his attorney to the Appeals Council during the course of the underlying administrative proceedings. Dkt. 2 (December 22, 2014 Letter to Appeals Council, Office of Hearing and Appeals, from Plaintiff's counsel, David Berger). Accordingly, the Court considers the arguments advanced by Plaintiff's attorney in that letter.

## A.    Evaluating Medical Evidence

### 1.    Medical Opinion Evidence

The Government argues that the ALJ properly evaluated the medical opinion of the consultative examiner, Dr. Sharon Revan, by according "little weight" to Dr. Revan's opinion that Plaintiff had mild-to-moderate sitting limitations and according "some weight" to Dr. Revan's opinion that Plaintiff had no limitations in the use of his upper extremities for fine and gross motor activity, and had mild-to-moderate limitations in personal grooming, activities of daily living, climbing stairs, walking, and standing due to leg pain.  Def. Mem. at 16 (citing R. 18, 282, 284).

An ALJ is obliged to consider medical opinions on a claimant's functioning and is tasked with reaching a residual functional capacity assessment based on the record as a whole.  20 C.F.R. §§ 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as … your residual functional capacity … the final responsibility for deciding these issues is reserved to the Commissioner.").  It is the Commissioner's role to weigh medical opinion evidence and to resolve conflicts in that evidence.  *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

Here, the ALJ accorded "little weight" to Dr. Revan's opinion that Plaintiff had mild-to-moderate sitting limitations because it was inconsistent with Dr. Revan's own findings that Plaintiff did not require any help changing for the examination or getting on and off the examination table.  R. 18-19.  Dr. Revan's treatment notes reveal that Plaintiff had full range of motion, full strength in his upper and lower extremities, a negative straight leg raise test bilaterally, stable joints, no sensory deficits, no muscle atrophy, intact hand and finger dexterity,

full grip strength bilaterally, no edema in the extremities, and was neurologically intact. R. 281-84. Therefore, the Court finds that the ALJ was within his discretion to resolve the conflict between Dr. Revan's opinion about Plaintiff's sitting limitations and Dr. Revan's finding that Plaintiff did not need help getting on and off the examination table and, ultimately, accord little weight to this portion of Dr. Revan's medical opinion evidence.

Accordingly, the ALJ properly evaluated Dr. Revan's medical opinions in making his residual functional capacity determination.

### 2. Listing § 9.00

The Government also argues that the ALJ properly evaluated the medical evidence by finding that Plaintiff did not meet or equal the requirements of Listing § 9.00. Def. Mem. at 15. Specifically, the Government argues that although Plaintiff presented evidence of episodes of hypocalcemia with reported symptoms of fatigue and numbness and tingling in his extremities, Plaintiff failed to show that his hypoparathyroidism resulted in parathyroid-related osteoporosis and fractures, cataracts, kidney failure, tetany, muscle spasms, or other complications of severity that would meet or equal Listing 9.00(B)(3). Def. Mem. at 15 (citing *Sullivan v. Zebley*, 493 U.S. 521 (1990). In his attorney's December 22, 2014 letter to the Appeals Council, Plaintiff argued that Plaintiff's condition actually did meet Listing 9.00 because Plaintiff's physical impairments include hypocalcemia, and generalized body pain. R. 174. Consequently, Plaintiff argues, the ALJ's finding that Plaintiff could perform sedentary work was not consistent with the record. R. 173.

In relevant part, Listing 9.00, "Endocrine Disorders," provides:

> A. ... An endocrine disorder is a medical condition that causes a hormonal imbalance. When an endocrine gland functions abnormally, producing either too much of a specific hormone (hyperfunction) or too little (hypofunction), the hormonal imbalance

19

can cause various complications in the body. The major glands of the endocrine system are the pituitary, thyroid, parathyroid, adrenal, and pancreas.

B. How do we evaluate the effects of endocrine disorders? We evaluate impairments that result from endocrine disorders under the listings for other body systems. For example:

\*\*\*

> 3. Parathyroid gland disorders affect calcium levels in bone, blood, nerves, muscle, and other body tissues. We evaluate parathyroid-related osteoporosis and fractures under 1.00; abnormally elevated calcium levels in the blood (hypercalcemia) that lead to cataracts under 2.00; kidney failure under 6.00; and *recurrent abnormally low blood calcium levels (hypocalcemia) that lead to increased excitability of nerves and muscles, such as tetany and muscle spasms, under 11.00.*

\*\*\*

Listing 9.00(A)-(B)(3) (emphasis added). The record includes evidence of Plaintiff's hypocalcemia, covered in Listing 9.00(B)(3). Listing 9.00(B)(3) references Listing 11.00 for the evaluation of hypocalcemia that leads to "increase excitability of nerves and muscles, such as tetany and muscle spasm." Listing 11.00, "Neurological," provides in relevant part:

> A. <u>Which neurological disorders do we evaluate under these listings</u>?
> We evaluate epilepsy, amyotrophic lateral sclerosis, coma or persistent vegetative state (PVS), and neurological disorders that cause disorganization of motor function, bulbar and neuromuscular dysfunction, communication impairment, or a combination of limitations in physical and mental functioning such as early-onset Alzheimer's disease.

\*\*\*

> C. ... In 11.02 (Epilepsy), 11.06 (Parkinsonian syndrome), and 11.12 (Myasthenia gravis), we require that limitations from these neurological disorders exist despite adherence to prescribed treatment. "Despite adherence to prescribed treatment" means that you have taken medication(s) or followed other treatment procedures for your neurological disorder(s) as prescribed by a physician for three consecutive months but your impairment

continues to meet the other listing requirements despite this treatment.

*\*\*\**

11.12 <u>Myasthenia gravis</u>, characterized by A, B, or C despite adherence to prescribed treatment for at least 3 months (see 11.00C):

> A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.

Listing 11.00(c); 11.12.

Here, the ALJ noted that he considered the additional listings that Listing 9.00 cross-references and found that "there is no substantial evidence that his hypoparathyroidism has resulted in parathyroid-related osteoporosis and fractures, cataracts, kidney failure, tetany, muscle spasms, or other complications of severity that would meet or equal Listing 9.00(B)(3)." R. 15. Although it is true that there is no evidence of parathyroid-related osteoporosis and fracture, cataracts, or kidney failure, there is some evidence that Plaintiff suffered from tetany[8] and muscle spasms. R. 18, 240, 281, 314, 318, 360. Tetany and muscle spasms are considered under Listing 11.00, Neurological. Although Listing 11.12 is the most relevant to Plaintiff's condition, Plaintiff's condition does not come close to meeting Listing 11.12 because Listing 11.12 requires that the claimant's condition result in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. Listing 11.12. The record does not reflect such extreme limitations of Plaintiff's ability to stand,

---

[8] Tetany is a disorder consisting of the involuntary contraction of muscles, usually associated with hypocalcemia. WILLIAMS, APARNA, DOOTIKA LIDDLE, AND VALSA ABRAHAM, Tetany: A Diagnostic Dilemma, Journal of Anaesthesiology, Clinical Pharmacology 27.3 (2011): 393–94, PMC, (Jun. 1, 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3161471/.

walk or use his upper extremities. In fact, the record actually contains various instances where Plaintiff exhibited normal strength, normal reflexes, and negative Trousseau[9] and Chvostek's signs.[10] R. 15 (citing R. 179-200, 234, 241, 281-284, 288-348, 357).

Accordingly, the ALJ properly evaluated the medical evidence and determined that Plaintiff's condition did not meet the relevant listings.

### 3. Obesity

In the December 22, 2014 letter to the Appeals Council, Plaintiff argued that the ALJ failed to consider the impact Plaintiff's obesity and his resulting ailments, such as increased fatigue, difficulty sitting, standing, and walking, would have on his ability to sustain full-time employment. R. 174. The Government contends that the ALJ accounted for Plaintiff's complaints of diminished energy due to his obesity when he limited him to sedentary work involving only simple and routine tasks. Def. Mem. at 17 (citing R. 15, 18; 20 C.F.R. § 416.945(c). The Court agrees.

Obesity is a medically determinable impairment to be considered in evaluating a Plaintiff's residual functional capacity. Social Security Ruling 02-01p, 2002 SSR LEXIS 1, at

---

[9] A Trousseau's sign is elicited by inflating a sphygmomanometer cuff (an instrument for measuring blood pressure, typically consisting of an inflatable rubber cuff that is applied to the arm and connected to a column of mercury next to a graduated scale). A resulting muscular contraction, including flexion of the wrist and metacarpophalangeal joints, hyperextension of the fingers, and flexion of the thumb is suggestive of neuromuscular excitability caused by hypocalcemia. FRANK L. URBANO, MD, Signs of Hypocalcemia: Chvostek's and Trousseau's Signs, (Turner White Communications Inc.), available at https://pdfs.semanticscholar.org/a4cb/3c355719d7146412aee89e56f0d8a28e9e52.pdf

[10] A Chvostek's sign is elicited by tapping on the face at a point just in front of the ear and below the zygomatic bone (cheekbone). A resulting twitching of the ipsilateral facial muscles is suggestive of neuromuscular excitability caused by hypocalcemia. FRANK L. URBANO, MD, Signs of Hypocalcemia: Chvostek's and Trousseau's Signs, (Turner White Communications Inc.), available at https://pdfs.semanticscholar.org/a4cb/3c355719d7146412aee89e56f0d8a28e9e52.pdf.

*16 (Sept. 12, 2002). "This does not mean, however, that an AL[J] must always explicitly discuss a claimant's obesity in his or her [residual functional capacity] determination; rather, an ALJ's determination can reflect an appropriate consideration of obesity if it adopts the limitations suggested by physicians who have directly considered the effects of obesity in their opinions." *Wilson v. Colvin*, No. 14 Civ. 5666, 2015 U.S. Dist. LEXIS 135651, at *102-104 (S.D.N.Y. Sept. 29, 2015); *see also* Soc. Sec. Reg. 02-01p, 2002 SSR LEXIS 1, *9 ("[w]hen the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI ... in most such cases we will use our judgment to establish the presence of obesity based on medical findings and other evidence in the case record").

Here, the ALJ's decision explicitly and implicitly considered Plaintiff's obesity and found that it did not prevent Plaintiff from sustaining full-time sedentary employment as prescribed in the ALJ's decision. R. 18. The ALJ explicitly considered obesity in making his residual functional capacity determination because he considered that "[i]t is very likely that claimant's obesity contributes to and magnifies the fatigue the claimant experiences from his thyroid impairment." R. 18. The ALJ also explicitly considered Plaintiff's obesity by noting that Plaintiff "is 5'11" tall, [and] was noted as weighing 236 pounds, which equates a BMI[11] of

---

[11]     The National Institutes of Health ("NIH") Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998) classify overweight and obesity in adults according to BMI. BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2). For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 at "overweight" and a BMI of 30.0 or above as "obesity."

The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III termed "extreme" obesity, represents the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of the obesity, but do not correlate with any specific degree of functional loss. SSR § 02-1p

32.9." R. 18. Additionally, the ALJ implicitly considered Plaintiff's obesity when he cited records, dated March 31, 2014, of Plaintiff's weight, height, and BMI. R. 18 (citing R. 281-84).

Since the ALJ explicitly and implicitly considered Plaintiff's obesity by evaluating his weight, BMI, records showing Plaintiff's high body weight, and the potential impact of Plaintiff's obesity on Plaintiff's ability to function, the ALJ properly considered obesity in making his residual functional capacity determination.

### 4. Credibility

The Government argues that substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not entirely credible to the extent alleged because (i) Plaintiff's ability to care for his personal needs was inconsistent with his allegations of total disability, Def. Mem. at 18-19 (citing R. 15-19, *Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009); (ii) Plaintiff inconsistently adhered to his treatment regime, Def. Mem. at 19 (citing R. 17, 235, 238, 247-53, 277, 328-32, 357, 384-86, 185, 347); (iii) Plaintiff's testimony at his administrative hearing that he needed to sit with his legs elevated to avoid feeling numbness in his feet, R. 41, conflict with his application for disability, which said that he could sit as long as his legs and hips were at the same height,[12] Def. Mem. at 20 (citing R. 154); (iv) Plaintiff did not work from 2000 to 2007 when he was able to work, Def. Mem. at 20 (citing R. 143, *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998)); and (v) Plaintiff's "treatment notes showed that although Plaintiff complained of fatigue and a sensation of numbness and tingling in his extremities, (R. 179, 314, 317), he had full muscle strength throughout, had a normal gait, was neurologically intact, had normal sensation on testing, and was fully oriented." Def. Mem. at 16

---

[12]    This claimed "conflict" is largely semantic. The Court is not persuaded that this alone supports the ALJ's credibility determination.

(citing R. 18, 179, 198-99, 234, 241, 320-21, 330, 338, 357).

In assessing plaintiff's subjective claims of pain and other symptoms, the ALJ must first determine whether there are "medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms," if this has been shown, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. SSR 96-7p.[13] When making a credibility determination, the ALJ can consider the following factors: (1) daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3). If after considering these factors the ALJ's findings "are supported by

---

[13]     Effective on March 28, 2016, SSR 16-3p, 2016 SSR LEXIS 4 superseded SSR 96-7p, 1996 SSR LEXIS 4. *See* SSR 16-3p, 2016 SSR LEXIS 4 (Mar. 28, 2016). The new ruling eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2016 SSR LEXIS 4, at *1. Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." 2016 SSR LEXIS 4, at *2. Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings. *Compare* SSR 96-7p, 1996 SSR LEXIS 4 with SSR 16-3p, 2016 SSR LEXIS 4. As the ALJ's decision in this matter was issued before the new regulation went into effect, this Court will review the ALJ's credibility assessment under the earlier regulation, SSR 96-7p, 1996 SSR LEXIS 4.

substantial evidence... the court must uphold the ALJ's decision to discount plaintiff's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). While it is true that an ALJ is required to consider the plaintiff's reports of pain and other limitations, 20 C.F.R. § 416.929, an ALJ is not required to accept the plaintiff's subjective complaints without question. *McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704-05 (2d Cir. 1980).

The ALJ here considered the aforementioned credibility factors in making this credibility determination. In particular, the ALJ considered (1) Plaintiff's daily activities, R. 16; (2) the location, duration, frequency, and intensity of the pain or other symptoms, R. 16-17; and (3) Plaintiff's treatment with medication, in particular, his inconsistent adherence to treatment despite evidence of its effectiveness. R. 16-18. Ultimately, the ALJ focused on the record evidence, which "consistently show[ed] normal strength testing, as well as intact sensation and reflexes, of the claimant's arms and legs." R. 18 (citing R. 319-325). Therefore, the ALJ did a thorough review of the record evidence before making a credibility determination.

In light of the foregoing, the ALJ's credibility determination was supported by substantial evidence. On this record, I decline to disturb the ALJ's credibility finding.

### 5. Vocational Expert

The Government argues that the ALJ properly relied on vocational expert testimony in making his residual functional capacity determination. Def Mem. at 21-22 (citing R. 44; *Dumas v. Scheiker*, 712 F.2d 1545, 1553-54).

"In the ordinary case," the Commissioner meets his burden at the fifth step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). The Grids "take[] into account the

claimant's residual functional capacity in conjunction with the claimant's age, education and work experience" and indicate whether the claimant can engage in any substantial gainful work existing in the national economy. *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). The Second Circuit has held, however, that an "ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert." *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013).

Here, the ALJ went beyond the Grids and obtained the testimony of a vocational expert to determine whether Plaintiff's specific limitations would impede Plaintiff's ability to perform all or substantially all of the requirements of sedentary work. R. 20. The Vocational Expert testified that an individual with Plaintiff's age, education, work experience, and residual functional capacity would be able to perform the requirements of representative occupations such as, (i) final assembler (DOT #713.687.019), (ii) addresser (DOT #209.587.010), and (iii) order clerk (DOT #209.567-014). R. 20. Based on this testimony, the ALJ concluded that Plaintiff would be capable of making a successful adjustment to other work that exists in significant numbers in the national economy. R. 20.

As discussed above, the ALJ's residual functional capacity assessment was supported by substantial evidence. Therefore, the ALJ gave the Vocational Expert a proper hypothetical based on the record evidence, a valid credibility determination, and an accurate depiction of Plaintiff's physical limitations. Accordingly, the ALJ properly relied on the vocational expert's opinion.

## VI.    CONCLUSION

For the foregoing reasons, Defendant's motion is **GRANTED**.  The Clerk shall terminate

the motion (Dkt. 10) and close the case.

Dated: June 7, 2017
       White Plains, New York

SO ORDERED

Paul E. Davison, U.S.M.J.


A copy of this Opinion and Order has been mailed to:

James A. Mitchell
1005 Walton Avenue
Apartment 12A
Bronx, New York 10452